COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:    Chief Judge Decker, Judge Chaney and Senior Judge Humphreys
Argued at Richmond, Virginia


LINDSEY SATTERWHITE, ADMINISTRATOR
  OF THE ESTATE OF JERRY DEAN ROBBINS,
  DECEASED
                                                     MEMORANDUM OPINION* BY
v.       Record No. 1868-23-2                 CHIEF JUDGE MARLA GRAFF DECKER
                                                        MARCH 18, 2025
JAVIER SALAS-ZARATE FRANCISCO, A/K/A
  FRANCISCO SALAS, ET AL.


            FROM THE CIRCUIT COURT OF MECKLENBURG COUNTY
                           S. Anderson Nelson, Judge

        Kevin Biniazan (Justin M. Sheldon; Jeffrey A. Breit; Breit Biniazan,
        P.C., on briefs), for appellant.

        C. Stephen Setliff (Setliff Law, P.C., on brief), for appellees.


        Lindsey Satterwhite—administrator of the estate of her deceased father, Jerry Dean

Robbins—filed a wrongful death lawsuit against Wilbourne Land and Timber, Inc., and Javier

Salas-Zarate Francisco.  Satterwhite appeals the circuit court's dismissal of the suit, arguing that the

court erred by granting the appellees' plea in bar.  She suggests that Robbins was not a statutory

employee of Wilbourne Land and Timber and, as a result, that her civil suit was not barred by the

exclusivity provisions of the Workers' Compensation Act.  We hold, based on existing law, that the

record supports the dismissal.  Accordingly, we affirm the judgment of the circuit court.

---

        * This opinion is not designated for publication.  *See* Code § 17.1-413(A).

BACKGROUND[1]

When Robbins died, he was employed as a commercial truck driver by Wilbourne Farms Trucking, LLC (Trucking). Trucking, a commercial hauling company, primarily transported forest products for a second company, Wilbourne Land and Timber, Inc. (Timber). Robbins was killed when one of Trucking's commercial vehicles accidentally ran over him.[2]

The present action began when Satterwhite filed a civil wrongful death suit in the circuit court seeking $3.5 million in damages from Timber and Javier Salas-Zarate Francisco, an employee of Timber. Timber and Francisco responded by filing an answer and plea in bar. The plea in bar alleged that Satterwhite was limited to the remedies provided under the Workers' Compensation Act. According to Timber and Francisco, under the Act, Robbins was a statutory employee of Timber and as a result also a statutory co-employee of Francisco when the accident happened. They suggested that, as against them, this status entitled Satterwhite to collect only workers' compensation benefits for Robbins's death.

The court held an evidentiary hearing on the plea in bar. A single witness, Adam Wilbourne, testified at that hearing.

Wilbourne explained that Timber and Trucking were interrelated but "distinct legal entities." Timber, a logging business, bought and harvested "forest products," "prepar[ed them] for hauling," and sold them. Trucking, a commercial-hauling business, primarily took the forest products of Timber "from their place of harvest to various [saw]mills for processing."

---

[1] When an appellate court reviews a ruling on a plea in bar on which the parties have presented evidence, the court "[]view[s] th[at] evidence in the light most favorable to the prevailing parties and accept[s] as true any reasonable inferences that c[an] be drawn from the evidence." *Forest Lakes Cmty. Ass'n v. United Land Corp. of Am.*, 293 Va. 113, 117 (2017).

[2] Following Robbins's death, his estate received benefits under the Workers' Compensation Act.

- 2 -

On November 17, 2020, Robbins was using Trucking's commercial tractor trailer (truck) to haul trees from Timber's logging site. Attached to the truck was a trailer owned by Timber. As Robbins departed in the truck pulling a fully loaded trailer, the vehicle became stuck on an unpaved access road maintained by Timber. Francisco, at the direction of Timber, drove a piece of heavy equipment called a skidder down the road to Robbins's truck. Before Francisco arrived, Robbins got out of the vehicle. When Francisco reached Robbins's truck, he did not make contact with Robbins and immediately began using the skidder to push the immobilized truck. When Francisco pushed the truck with the skidder, Robbins was knocked to the ground, and the truck ran over him.

In his testimony, Wilbourne elaborated on the relationship between Timber and Trucking, which were under his "common ownership." Although the two businesses were legally separate, he viewed them as one "blanket company." He explained that he created Trucking for the "primary purpose" of "transport[ing] harvested" wood for Timber and added that it "would not exist" without Timber. Due to the type of license Trucking had, it could work "only . . . for itself and . . . Timber."[3] Wilbourne said that Timber had never been federally licensed to haul its own logs and had never done so. Before the creation of Trucking, Timber used outside contractors to transport its felled trees. Timber's primary contractor hauled seventy-five to eighty percent of Timber's lumber at that time. When that contractor raised its prices, Wilbourne "elected to go buy [his] own truck so . . . Timber could . . . control some of the costs." He created Trucking, and after that time, Trucking or an unrelated contractor hauled Timber's lumber.

Wilbourne indicated that Timber and Trucking "work[ed] together on a daily basis to accomplish the business purposes of . . . Timber," which he described as cutting trees, loading

---

[3] Trucking also transported "farm products" for Wilbourne Farms, a separate legal entity.

them on a trailer, and transporting them "to the [appropriate] mill so that they c[ould] be sold."[4] Timber paid Trucking by the mile for hauling, using a fluctuating rate based on "what the mills pa[id]" for the lumber. Wilbourne said that if Trucking's trucks "d[id]n't haul," Timber "d[id]n't get a paycheck."

Timber's employees performed all the training of Trucking employees, including safety training. At least some of the training was combined with training for Timber employees. Additionally, while Trucking employees were at a worksite, they were supervised by a Timber employee—Wilbourne or a Timber foreman. If a Trucking employee required discipline, the Timber employee would discipline or fire that employee. If a problem arose with the logging access road or one of Trucking's trucks, a Timber employee would perform the repair or provide other necessary help. Timber employees also performed routine maintenance on Trucking's vehicles, and Timber bought the oil, tires, and other supplies needed to do so. Trucking did not employ any mechanics and did not reimburse Timber for supplies or labor. Timber also shared office space and pooled related resources with Trucking because, according to Wilbourne, "there[ wa]s not enough revenue for [Trucking] to stand alone."

Wilbourne testified that Timber used Trucking drivers to haul lumber and "move [its] equipment" and "crews." He explained that employees of Timber drove Trucking's trucks "[q]uite frequently," "at least once a week," because "several" Trucking drivers were "out [each] week." Wilbourne noted multiple situations in which Trucking needed Timber employees to drive its trucks. He pointed to the COVID-19 pandemic and a national truck driver shortage, as well as smaller-scale personnel issues.[5] Wilbourne also indicated that all Timber foremen held

---

[4] Wilbourne explained that Timber's employees and Trucking's drivers loaded the logs together, providing extensive testimony about how they did so.

[5] Wilbourne testified that he himself drove a Trucking truck for forty days in a row during the pandemic.

commercial driver's licenses (CDLs). *See generally* Code § 46.2-341.4 (defining the term "[c]ommercial driver's license"). Additionally, the foremen were "instructed when . . . hired that . . . [Trucking] ha[d] spare trucks." Wilbourne elaborated that anytime a Timber foreman was not needed for some other task, that foreman would "get in [a] tractor trailer and help[] haul wood," thereby "increas[ing] the . . . revenue" for Timber. And Wilbourne responded affirmatively when asked if Timber employees "normally dr[o]ve trucks to carry logs" to the mills. Finally, Wilbourne stated that at the time of Robbins's death, when a Timber employee drove a Trucking truck, the employee was "paid by . . . Timber exclusively."

The circuit court ruled that when Robbins died, he was a statutory employee of Timber for purposes of the Act. Based on the Act's exclusivity provisions, the court concluded that Satterwhite's sole remedy for her father's death was workers' compensation benefits. In reaching this determination, it noted that Trucking would not exist without Timber and, based on the type of "license" Trucking had, it could work only for itself and Timber. The court also pointed out that the two companies shared office space and personnel and that maintenance and repair were paid for by Timber. Finally, it observed that Timber conducted combined training for both companies, supervised Trucking employees, and had the authority to discipline and terminate Trucking employees. On those bases, the court held that Satterwhite could not maintain a civil suit against Timber or Francisco and was limited to the benefits available under the Act. It sustained the plea in bar and dismissed the lawsuit.

### ANALYSIS

Satterwhite contends that the circuit court erred by granting the plea in bar based on its ruling that Timber and Robbins had a statutory employer-employee relationship under the Act, thereby barring her civil suit against Timber and Francisco.

- 5 -

When an appellate court reviews a ruling on a plea in bar on which the parties have presented evidence "ore tenus, the circuit court's factual findings 'are accorded the weight of a jury finding and will not be disturbed on appeal unless they are plainly wrong or without evidentiary support.'" *Cornell v. Benedict*, 301 Va. 342, 349 (2022) (quoting *Massenburg v. City of Petersburg*, 298 Va. 212, 216 (2019)). To the extent the review rests on legal questions, including ones involving statutory construction, the appellate court reviews that aspect of the circuit court's ruling de novo. *Id.*

It is well established that workers' compensation benefits generally provide the "exclusive remedy for a workplace injury falling within the Act." *Hartford Underwriters Ins. Co. v. Allstate Ins. Co.*, 301 Va. 460, 469 (2022). Code § 65.2-307(A) prevents a covered employee or his administrator from "seek[ing] any other remedy against the employer or his fellow employees." *Jones v. Commonwealth*, 267 Va. 218, 222 (2004).

For the Act to apply, "an employment relationship of some kind [must] exist between [the] claimant [or her decedent] and the party allegedly liable for compensation." *Jeffreys v. Uninsured Emp.'s Fund*, 297 Va. 82, 90 (2019). The most basic "scenario is a true employer-employee relationship[,] in which the employer controls the employee's jobsite conditions, employment tasks, and working hours." *Id.* However, the Act recognizes an additional "category of employment relationship called '[s]tatutory employer.'" *Id.* (citing Code § 65.2-302). These classifications—"true" employer-employee and "statutory" employer-employee—govern who is entitled to workers' compensation coverage and, conversely, who, because of a *lack* of coverage, is entitled to maintain an independent civil suit. *See id.*; *accord Pfeifer v. Krauss Constr. Co. of Va., Inc.*, 262 Va. 262, 266-67 (2001) (citing Code § 65.2-307(A)). Like employers and employees in a true employment relationship, statutory employers and employees are bound by the exclusivity provisions of Code § 65.2-307(A), which

- 6 -

limit a covered employee or his next-of-kin to the "rights and remedies" under the Act.  *See*

*Jones*, 267 Va. at 222.

It is undisputed here that Robbins was an employee of Trucking, which was a

subcontractor of Timber.  The dispositive question is whether the circuit court correctly

concluded that Robbins was also a statutory employee of Timber, thereby entitling Satterwhite to

death benefits under the Act and, correspondingly, barring her from bringing a civil suit against

Timber and its employee, Francisco.  "[W]hether a particular person or entity [wa]s the statutory

employer of an injured employee . . . present[s] a mixed question of law and fact that must be

determined under the facts of each case."  *Moore v. Va. Int'l Terminals, Inc.*, 283 Va. 232, 235

(2012) (quoting *Bosley v. Shepherd*, 262 Va. 641, 648 (2001)).  As a result, the Court reviews the

factual components of that determination for plain error and considers application of the relevant

law de novo.  *See Cornell*, 301 Va. at 349.

An individual or company may be a statutory employer of the employees of certain

subcontractors.  *See Jeffreys*, 297 Va. at 90-92 & 92 nn.3-4.  "[T]he mere fact that a business

owner engages an independent contractor does not [automatically] make that independent

contractor's employees statutory employees of the owner."  *Id.* at 92 (quoting *Rodriguez v.*

*Leesburg Bus. Park, LLC*, 287 Va. 187, 194 (2014)).  Code § 65.2-302 provides that the person

or business is liable for workers' compensation benefits as a statutory employer under specified

circumstances.  *See Princess Anne Builders, Inc. v. Faucette*, 37 Va. App. 102, 109-12 (2001).

Subsections (A) and (B) set out two tests for coverage of an employee under the Act by a

statutory employer.  *Id.* at 109-11 (citing *Cinnamon v. Int'l Bus. Machs. Corp.*, 238 Va. 471, 476

(1989)) (noting that subsection (C) augments those tests); *see Jeffreys*, 297 Va. at 90-92 & 92

nn.3-4.  Subsection (A) establishes what is known as the "normal-work test," and subsection (B),

treated as an exception, sets out the "subcontracted-fraction test."  *Princess Anne Builders*, 37

Va. App. at 110-11 (quoting *Cinnamon*, 238 Va. at 476). If either test applies, the worker is a statutory employee covered by the Act, preventing him or his next-of-kin from suing his statutory employer or any of his statutory co-employees. *See Jeffreys*, 297 Va. at 90-92; *Pfeifer*, 262 Va. at 266-67.

We first consider the normal-work test. That test provides coverage under the Act to "all persons engaged in *any work that is a part of the trade, business[,] or occupation of the original party* who undertakes as owner, or contracts as contractor, to perform that work." *Jeffreys*, 297 Va. at 92 n.5 (emphasis added) (quoting *Cinnamon*, 238 Va. at 475 n.1). In other words, "every . . . owner, or contractor, and subcontractor[ who is higher in the chain] above [an] employee [engaged in *conforming* work]" is liable for injury to the worker as a statutory employee. *See id.* (quoting *Cinnamon*, 238 Va. at 475 n.1). This test ensures "that an owner cannot escape liability under the Act by merely contracting away work" if that work "'is part of the owner's trade, business, or occupation.'" *Rodriguez*, 287 Va. at 194 (quoting *Cinnamon*, 238 Va. at 478). If, however, "the employe[e] reaches an employer in the ascending scale, of whose trade, business[,] or occupation the work being performed by the employe[e] is *not* a part, then that employer is not liable to that employe[e] for compensation" under the Act. *Cinnamon*, 238 Va. at 475 n.1 (first, third, and fourth alterations in original) (emphasis added) (quoting *Sykes v. Stone & Webster Eng'g Corp.*, 186 Va. 116, 122 (1947)). "At that point" in the process, Code § 65.2-101 "intervenes and the employe[e]'s right of action at common law is preserved." *Id.* (alteration in original) (quoting *Sykes*, 186 Va. at 123) (applying a predecessor of Code § 65.2-101).[6]

---

[6] Cases decided under the Act classify this status as being a "stranger to the work." *See, e.g.*, *Napper v. ABM Janitorial Servs.-Mid Atl., Inc.*, 284 Va. 55, 62, 64 (2012) (explaining that "other party" language in Code § 65.2-309, which reflects preservation of an injured employee's right to bring a civil action against a stranger to the employment relationship, is the inverse of being a statutory employee).

Evaluating "whether work is part of the trade, business, or occupation of an owner" under Code § 65.2-302(A) "'is not a simple, straightforward exercise.'" *Rodriguez*, 287 Va. at 193 (quoting *Henderson v. Cent. Tel. Co. of Va.*, 233 Va. 377, 382 (1987)). Instead, "it 'depends upon the facts and circumstances of the particular case [and] "does not readily yield to categorical or absolute standards."'" *Id.* (alteration in original) (quoting *Johnson v. Jefferson Nat'l Bank*, 244 Va. 482, 485 (1992)). As a result, "[d]etermining whether work is part of the trade, business, or occupation of an owner is a mixed question of law and fact." *Id.*; *accord Henderson*, 233 Va. at 382 (citing *Bassett Furniture Indus., Inc. v. McReynolds*, 216 Va. 897, 902 (1976)); *see also Jeffreys*, 297 Va. at 99 n.14 (characterizing the determination of whether companies were "engaged in the construction business" as a factual finding).

Virginia's common law helps define the boundaries of the normal-work test. It "is not one of whether the subcontractor's activity is useful, necessary, or even absolutely indispensable to the statutory employer's business, since, after all, this could be said of practically any repair, construction[,] or transportation service." *Shell Oil Co. v. Leftwich*, 212 Va. 715, 722 (1972) (quoting 1A Arthur Larson, *The Law of Workmen's Compensation* § 49.12, at 872-73), *quoted in Jeffreys*, 297 Va. at 95. The primary formulation of this test, instead, is whether the "indispensable activity" is, "in that business, *normally* carried on through employees rather than independent contractors." *Id.* (quoting 1A Larson, *supra*, at 872-73 (emphasis added)), *quoted in Jeffreys*, 297 Va. at 95. "Frequency and regularity of performance are factors to be considered" in applying the test. *Bassett Furniture*, 216 Va. at 902. "Mere capacity to perform, standing alone, is not determinative. Nor is performance [that] is a *de minimis* part of the total business operation." *Id.* at 903 (citations omitted). Rather, the test encompasses work that the "owner or employer . . . [it]self generally does perform." *Holt v. Bowie*, 343 F. Supp. 962, 965 (W.D. Va. 1972) (applying Virginia law), *cited with approval in Bassett Furniture*, 216 Va. at 903. And

key to this case, where employees perform this activity *alongside* an independent contractor, the normal-work test can be satisfied if the parallel performance is routine. *Compare Fowler v. Int'l Cleaning Serv., Inc.*, 260 Va. 421, 423-24, 426-29 (2000) (holding the normal-work test was satisfied because the retail furniture business required a "clean, attractive, and safe" showroom and its employees and subcontractor cleaning company routinely shared supplies and worked together to meet that standard), *with Napper v. ABM Janitorial Servs.-Mid Atl., Inc.*, 284 Va. 55, 64-66 (2012) (distinguishing *Fowler* in part because the call-center business did not receive customers in its office or work with the janitorial company to clean its own premises).

Here, the facts upon which the circuit court expressly relied support its ruling that Timber was Robbins's statutory employer under the normal-work test of Code § 65.2-302(A). The testimony of Wilbourne, the owner of both companies, viewed under the proper standard, established that transporting raw lumber to a sawmill was part of the work that Timber generally performed *along with Trucking*. *See Hawthorne v. VanMarter*, 279 Va. 566, 577 (2010) (noting that if the parties present testimony on a plea in bar, "the circuit court's factual findings . . . will not be disturbed on appeal unless . . . plainly wrong"); *Va. Int'l Gateway, Inc. v. City of Portsmouth*, 298 Va. 43, 62 (2019) (recognizing that assessing witness credibility is a factual finding). Although Timber and Trucking were separate companies, Wilbourne operated them largely as if they were one, rendering them inextricably linked. Trucking owned the trucks that transported Timber's lumber to the sawmills as well as moved equipment and crews, and Trucking had employees who drove those trucks. But the evidence established that Trucking was created for the primary purpose of hauling wood for Timber and had a license permitting it to work only for itself and Timber. Importantly, Timber's foremen *also* drove Trucking's trucks for the purpose of transporting lumber and equipment. Further, Timber employees helped load every truck, and Timber provided significant financial subsidies to Trucking, contributing the

- 10 -

labor and supplies for routine maintenance and repairs. Timber also provided managerial oversight for training, supervising, disciplining, and firing Trucking employees, and the two companies shared office space. Consequently, Timber regularly performed trucking services both directly, by actually driving the trucks, and indirectly, by heavily subsidizing Trucking's activities.

The evidence further established that Timber's direct involvement in Trucking's lumber-hauling and other driving activities was routine rather than de minimis. *See Bassett Furniture*, 216 Va. at 902-03. Timber's employees filled in "[q]uite frequently" when Trucking's drivers were absent, "at least once a week," and Timber's foremen, who all had CDLs, "normally dr[o]ve" Trucking's "trucks to carry logs" to the mills.[7] Timber foremen knew that Trucking had *extra* trucks, and they were under instructions to drive loads of logs to the sawmills whenever they did not have other necessary tasks to perform. Finally, at the time of Robbins's death, Timber's foremen and other employees were paid "exclusively" by Timber, not by Trucking, for their work driving Trucking's vehicles. Under the totality of the circumstances, Timber's trucking activities were not de minimis.

This evidence proved that Robbins, while hauling lumber as an employee of Trucking, was engaged in work that qualified as "part of [the] trade, business[,] or occupation" of Timber at the time of his death. *See* Code § 65.2-302(A). As a result, the record, viewed in light of the Act's normal-work test, supports the circuit court's ruling that Robbins was a statutory employee of Timber.

---

[7] Wilbourne noted an even greater need for Timber employees to drive Trucking trucks during the pandemic, saying he himself, as an employee of Timber, hauled wood for forty straight days during that time. *See, e.g.*, *Osman v. Commonwealth*, 76 Va. App. 613, 633-34 (2023) (addressing the time span of the pandemic). Robbins's work accident and death of November 17, 2020, occurred during the height of the pandemic. *See id.*

This same evidence establishes that Robbins was a statutory co-employee of Francisco under the Act. To be statutory co-employees, workers must have an employer or statutory employer in common somewhere in the chain of employment. *See Fowler*, 260 Va. at 426, 428-29 (holding that "a worker employed by an owner [wa]s a statutory fellow employee of a contractor engaged to perform work on the owner's premises" rather than a "stranger to [the] business"); *see also Rodriguez*, 287 Va. at 195 (holding that Code § 65.2-302 "bring[s] within . . . the Act all persons engaged in work that is a part of the trade, business, or occupation of" the owner's or contractor's work (quoting *Pfeifer*, 262 Va. at 266)). Here, Timber's status as Robbins's statutory employer made Timber's employee, Francisco, the statutory co-employee of Robbins. And statutory co-employees, like statutory employers, "are entitled to the exclusivity protections of the Act. [An] injured worker's sole remedy for job-related injuries caused by [a] statutory co-employee[] is a claim against his . . . statutory employer for . . . workers' compensation benefits. He may not bring a common-law action against his statutory co-employee[]." *David White Crane Serv. v. Howell*, 282 Va. 323, 328 (2011) (citation omitted).

The decision of the Supreme Court of Virginia in *Floyd v. Mitchell*, 203 Va. 269, 273 (1962), supports this result. In that case, which involved similar facts, the Supreme Court held that the shipping company was performing work that was "*part of* the trade, business[,] or occupation of" the primary company, a pipe manufacturer, and, therefore, that Floyd's administrator was limited to the benefits provided under the Act. *Id.* at 273-74, *cited with approval in Conlin v. Turner's Express, Inc.*, 229 Va. 557, 558-60 (1985) (holding a contractor moving equipment between Ford's plants was "engaged in Ford's trade, business, or occupation" when the contractor's trailer malfunctioned, injuring a Ford employee).[8] Applying settled legal

---

[8] Our holding applying Virginia law is in keeping with the general rule regarding manufactured products in other jurisdictions. *See generally* 4 Lex K. Larson & Thomas A. Robinson, *Larson's Workers' Compensation Law* § 70.06[8] (Matthew Bender, rev. ed. 2024)

principles, we conclude that the fact that the deceased employee in *Floyd* worked for the owner company while Satterwhite's decedent worked for the subcontractor company is a distinction without a difference on the facts of this case. *See Nichols v. VVKR, Inc.*, 241 Va. 516, 519 (1991).[9]

Consequently, the Act bars Satterwhite's civil suit against Timber and Francisco.[10]

CONCLUSION

We hold the circuit court did not err by granting the appellees' plea in bar. The record supports its determination that Robbins was a statutory employee of Timber and, as a result, that Satterwhite's civil suit against both Timber and Francisco was barred by the exclusivity provisions of the Act. We therefore affirm the circuit court's dismissal of the suit.

*Affirmed.*

---

("Delivery and transportation cases turn largely on . . . whether the delivery activity was routine or extraordinary for this type of business. The . . . delivering of logs or rough lumber to a lumber mill [is routine]. . . . The ordinary rule is that a manufacturer's business ceases with the *manufacture* of the good . . . ." (emphasis added) (footnotes omitted)).

[9] "Contractors, subcontractors, and *all workers* who are engaged in the trade, business, or occupation of the owner of a project are deemed to be statutory fellow employees." *Nichols*, 241 Va. at 519 (emphasis added); *see also Snowden v. Va. Elec. & Power Co.*, 432 F. Supp. 266, 268 (E.D. Va. 1976) (recognizing that a subcontractor's injured employee can bring a civil suit against a third party for his injuries only if the third party qualifies as an "other party" within the meaning of the Act), *cited in Carmody v. F.W. Woolworth Co.*, 234 Va. 198, 206 (1987); Code § 65.2-800(C) (defining "other party" to *exclude* people employed by either an employer or statutory employer).

[10] Because we hold the normal-work test of Code § 65.2-302 applied to bar Satterwhite's civil suit, we do not consider application of the subcontracted-fraction test. *See generally Hartford Underwriters*, 301 Va. at 474 n.13 (recognizing the duty of appellate courts to decide appeals "on the best and narrowest grounds available" (quoting *Commonwealth v. White*, 293 Va. 411, 419 (2017))).